# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01536-COA

**EUGENE EALY**                                                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                  **APPELLEE**

DATE OF JUDGMENT:                       09/18/2017
TRIAL JUDGE:                            HON. JOHN HUEY EMFINGER
COURT FROM WHICH APPEALED:              MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:                 JACOB WAYNE HOWARD
ATTORNEY FOR APPELLEE:                  OFFICE OF THE ATTORNEY GENERAL
                                        BY: MATTHEW WALTON
DISTRICT ATTORNEY:                      MICHAEL GUEST
NATURE OF THE CASE:                     CRIMINAL - FELONY
DISPOSITION:                            AFFIRMED - 11/05/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**GREENLEE, J., FOR THE COURT:**

¶1.     In 2006, Eugene Ealy pled guilty to murder for his participation in a shooting that occurred when Ealy was sixteen years old. He was sentenced to life imprisonment without eligibility for parole (life without parole), which was the only available statutory sentence. After the United States Supreme Court held in *Miller v. Alabama*, 567 U.S. 460 (2012), that mandatory life without parole sentences for juveniles are unconstitutional, the circuit court vacated Ealy's sentence, held a sentencing hearing as mandated by *Miller*, and resentenced Ealy to life without parole. Ealy appeals. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On October 26, 2004, sixteen-year-old Ealy and two friends—brothers, fifteen-year-old Dunta Dotson and thirteen-year-old Robert Dotson—drove a stolen truck from Jackson, Mississippi, to Madison County, Mississippi, with the intent to steal a four-wheeler for Ealy. Ealy and Dunta had already stolen a four-wheeler for Dunta and determined Ealy needed one as well. Ealy and Dunta had surveyed several neighborhoods and decided earlier that day that they would steal a specific four-wheeler that they had noticed in the back of a truck parked at a home. They also observed a white Cadillac in the driveway. Ealy and Dunta recruited Robert as a third driver before returning to the home.

¶3. When they arrived back at the home, they parked, and Ealy and Dunta knocked on the door. Both were armed with .38-caliber pistols. Robert Jeanes came to the door, and Ealy asked Jeanes if he could use his phone. Jeanes obliged. Ealy and Dunta engaged in small talk with Jeanes and then returned to their car, where they discussed their next move. According to Dunta, Ealy said, "[W]e should rob him but then again a dead man can't talk." Ealy and Dunta also told Robert that he would have to drive.

¶4. Ealy and Dunta exited the stolen truck again and knocked on Jeanes's door. Ealy again asked to borrow Jeanes's phone, and Jeanes obliged. But this time, Ealy handed the phone back to Jeanes, and Dunta shot Jeanes in the head. With Jeanes's body in the doorway, Ealy and Dunta entered the home and stole firearms, a television, and other electronics. They retrieved the keys for both of Jeanes's vehicles from inside the home. Ealy then drove Jeanes's truck with the four-wheeler in the back, and Dunta drove Jeanes's Cadillac back to Jackson. Robert drove the stolen truck they had arrived in, but after Robert wrecked into a

2

ditch, they abandoned the stolen truck; Robert then rode back with Ealy. Police found Jeanes's white Cadillac parked across the street from Ealy's father's home in Jackson.

¶5.     Ealy agreed to talk to an investigator, waived his *Miranda*[1] rights, and confessed to his participation in the crime. He led police to Jeanes's four-wheeler, which was at a nearby home. The four-wheeler had been painted and labeled with Ealy's nickname. Ealy also told police that the stolen firearms were at Dunta and Robert's house. The firearms were found under Dunta's bed in Dunta and Robert's bedroom. Police also found a .38-caliber pistol on a dresser.

¶6.     A Madison County grand jury indicted Ealy for capital murder under Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2004). On July 12, 2006, Ealy pled guilty to murder as a lesser-included offense of capital murder under Mississippi Code Annotated section 97-3-21 (Rev. 2004). As a factual basis for his plea, Ealy admitted under oath that "D[u]nta shot and killed Robert Jeanes while [Dunta] and [Ealy] were engaged in armed robbery of [Jeanes]." The Madison County Circuit Court sentenced Ealy to serve life in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. This was the only possible sentence the court could impose because section 97-3-21 required, and still requires, a life sentence for murder, and Mississippi Code Annotated section 47-7-3(1)(f) (Rev. 2004) precluded parole eligibility for those convicted of violent crimes between June 30, 1995, and July 1, 2014.

¶7.     In 2013, Ealy filed a motion for post-conviction relief, seeking to vacate his sentence

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

based on the United States Supreme Court's decision in *Miller*. The motion was granted, and the Madison County Circuit Court vacated Ealy's sentence for resentencing under *Miller* and *Parker v. State*, 119 So. 3d 987 (Miss. 2013) (applying *Miller*).

¶8.    Before the resentencing hearing, Ealy filed several motions, including a motion for mental evaluation and treatment. The circuit court granted the motion so that psychologist Dr. Criss Lott could address the presence of mitigating factors for sentencing. Ealy also filed a motion for jury sentencing, which the circuit court denied.

¶9.    In May 2017, the court conducted the *Miller* sentencing hearing. It heard testimony from Investigator Kelly Edgar, Dr. Lott, Kenneth Jeanes, and Michael Jeanes. Investigator Edgar was employed at the Madison County Sheriff's Department at the time of Jeanes's murder, and he testified about the investigation. Dr. Lott—the court-appointed psychologist—interviewed Ealy and some of Ealy's family members before the hearing, and he testified about his findings. Jeanes's family members, Kenneth and Michael, gave victim-impact statements. Ealy also testified, apologizing and stating: "I understand what I didn't understand back then. I was young in mind, not just young of age, and with age will come maturity, and I feel like I've elevated myself to that maturity. . . ." He further described his incarceration: "The only thing I knew was to protect myself, do what I had to do to survive. Okay. I did that. Over the years I have changed." At the conclusion of the hearing, the court took the matter under advisement so it could consider the "voluminous records" provided at the hearing.

¶10.    In September 2017, the circuit court reconvened the parties and resentenced Ealy to

4

life without parole. The court made oral findings on each *Miller* factor: (1) "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "family and home environment that surrounds [the defendant]"; (3) "circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth"; and (5) "the possibility of rehabilitation." *Miller*, 567 U.S. at 477-78.

### 1.    *Age and Its Hallmark Features*

¶11.    Ealy was sixteen years and two months old at the time of the crime—the oldest of the three boys involved in the crime. Dr. Lott testified that Ealy's IQ of 83 was in the average to low-average range. The court noted Dr. Lott's testimony that Ealy exhibited "the hallmark features . . . of . . . youthful offenders, such as: [p]oor decision-making, not thinking about the future, giving into peer pressure, risk-taking, impulsivity, and self-control." Dr. Lott opined that Ealy's age made him more likely to act irrationally and impulsively. As to the crime itself, while Dr. Lott recognized that Ealy had engaged in preparations to commit a crime, he believed that the ultimate act was "careless and haphazard."

¶12.    The court noted that despite Dr. Lott's opinion that the murder was an impetuous act, the evidence showed that the crime was "a planned action over a period of hours, if not multiple days, with the crime spree that was going on." The court found the offense was not "spur of the moment" or "haphazard." Rather, Ealy and Dunta had been stealing trucks for

5

multiple days for the purpose of using those trucks to steal four-wheelers. They scoped out Jeanes's house and picked up Robert so they would have enough drivers to steal the two vehicles parked in Jeanes's driveway. Ealy and Dunta each carried handguns, and the court noted that there was evidence that Ealy had provided the handguns. Further, the court found there were multiple opportunities for Ealy to abandon the crime, but Ealy chose not to. The court found that when they arrived at Jeanes's house and realized someone was home, they could have left, but instead, according to Dunta, Ealy instructed that they should keep walking and "play it off"—asking Jeanes for his phone and pretending they were lost. Further, both Dunta and Robert stated that after Ealy borrowed Jeanes's phone the first time, Ealy handed it back, and he and Dunta returned to the vehicle they had arrived in. He and Dunta then had a conversation about the crime—at which time they could have left—but instead went back to Jeanes's door and asked to borrow his phone again, and then Dunta shot him.

¶13.    The court further found that the crime was not "a direct result of any peer pressure" associated with age; rather, "it appear[ed] to be more of a lack of respect for human life and for other people's property," which "would seem to be a motivator for these types of crimes regardless of the age . . . ." The court found that Ealy was "a leader or at least co-equal participant" in the crime. Thus, the court ultimately concluded that other than Ealy's age, "there appears to be little else in this area that would weigh in favor of a sentence of life with parole."

2.    *Family and Home Environment*

6

¶14.    As to Ealy's family and home environment, Ealy was the seventh of eight children, and his parents divorced when he was two. He lived with his mother and had little contact with his father until age ten. His mother consistently worked one or two jobs. She reported that Ealy did well in elementary school but then developed behavioral problems after age ten when he went to live with his father, where he was "pretty much unsupervised," according to Dr. Lott's evaluation. He was suspended from school more than once for violent acts. There were reports of violence between Ealy's parents, and Dr. Lott found that the parental conflict as well as the lack of a male role model early in life increased Ealy's risk of delinquency and gang affiliation. Here, after considering the testimony, the court found that "certainly . . . Ealy did not have an ideal home environment or educational experience" and that "[t]his factor weigh[ed] slightly in favor of a sentence of life with parole."

### 3.    Circumstances of the Murder

¶15.    The court found that although Ealy was not the actual killer, "the evidence presented show[ed] that Ealy was a leader and that [the murder] happened how Ealy expected it to happen and it happened after there had been plenty of time for Ealy and [Dunta] to abandon the crime." The court further found that Ealy demonstrated "a lack of respect for human life and for other people's property" and that this was "a predominant motivator" for the crime: Ealy and Dunta "wanted what they wanted no matter what they had to do to get it." The court concluded that "everything about this crime itself favors [a] life without parole sentence."

### 4.    Incompetencies of Youth

¶16.    On the next *Miller* factor—"that [Ealy] might have been charged and convicted of a

lesser offense if not for incompetencies associated with youth"—the court found that while Ealy was only sixteen years old, "nothing in this case . . . indicates that Ealy's conviction was a result of any incompetency associated with his youth." The court noted that Ealy "had two able attorneys representing him" who were able to negotiate a plea to murder, although Ealy was "clearly guilty of capital murder." The court found there was not "anything here that would say that Mr. Ealy's youth or unfamiliarity with the legal system had any impact on the outcome of this case."

### 5. *Possibility of Rehabilitation*

¶17. Lastly, as to the possibility of rehabilitation, the court noted that it found Dr. Lott's report and testimony "most concerning" on this factor. Dr. Lott testified that it is impossible to predict if a youthful offender will reoffend. Dr. Lott presented several studies showing that the older an offender is when released, the less likely the person is to reoffend. Specifically, he testified that studies show that people released after age forty tend to have a low recidivism rate. Ealy was twenty-nine at the time of the resentencing hearing. Thus, according to Dr. Lott, he would be better able to determine later down the road whether Ealy could be rehabilitated. However, Dr. Lott concluded that because Ealy had an average-to-low-average intelligence, he saw no impediment to Ealy being rehabilitated. Dr. Lott further found that Ealy had shown signs of maturity while in prison, such as working toward his GED, no longer affiliating himself with a gang, and exhibiting less "severe" behavior over time.

¶18. The court considered Dr. Lott's testimony but ultimately concluded that "simply

because there's no impediment [to rehabilitation] doesn't mean that he can be [rehabilitated] . . . ." In making this finding, the court considered the extensive evidence of Ealy's violent and disrespectful behavior in prison. According to the "Drill Down Detail Report" provided by the MDOC, between Ealy's booking in prison in July 2006 and the May 2017 *Miller* hearing, Ealy had been the subject of over eighty incidents and rule-violation reports.

¶19. Between 2007 and 2014, Ealy was written up at least eleven times for exhibiting threatening and disrespectful behavior toward officers, including: (1) threatening officers with shanks, (2) threatening to slap an officer, (3) charging at an officer in a threatening manner, (4) using verbal or obscene language, such as calling a female officer a "monkey b----," (5) throwing an unknown liquid at officers, and (6) stealing an officer's pen. In specific instances in 2007, Ealy was written up for assaulting an officer by pushing the officer in the chest and for assaulting a transport officer. In 2009, he assaulted an officer and another inmate. In 2013, he grabbed a female officer's buttocks while she was attempting to conduct an inmate count. In 2014, another physical altercation was reported, but the details of that altercation are not provided. Also, between December 2006 and November 2011, correctional officers reported on at least eleven occasions that Ealy had intentionally masturbated in front of or otherwise intentionally exposed himself to correctional officers or nurses.

¶20. There were multiple reports of property destruction, fights, and refusals to obey officers' commands and prison rules. He was cited multiple times for possession of contraband, including a cellphone, a cellphone charger, tobacco, shanks, a broken broom

handle, and $200 in cash. In 2011, he tested positive for the use of THC (marijuana).

¶21.    The court noted that many of the infractions were "just a natural circumstance of people being incarcerated together," but many were violent in nature, and several appeared to be new felonies for which charges were not brought. The court found that the continual violent behavior and failure to follow instructions weighed against the possibility of rehabilitation.

¶22.    Based on the court's *Miller* evaluation, the court concluded the evidence supported a sentence of life without parole. Thus, the court found the statutory sentencing guidelines of section 47-7-3 were "not constitutionally prohibited" and resentenced Ealy to life imprisonment without eligibility for parole.[2]

¶23.    Ealy now appeals, arguing that his sentence must be vacated because: (1) the Eighth Amendment requires a specific finding of permanent incorrigibility; (2) due process requires a specific finding of permanent incorrigibility; (3) the circuit court was not the proper sentencing authority; (4) the State bears the burden of demonstrating parole eligibility; (5) the circuit court applied the incorrect legal standard; (6) the circuit court's findings are not supported by the evidence; and (7) his sentence is unconstitutional.

_____

[2] As of August 2018, the Mississippi Office of State Public Defender reported that eighty-seven juveniles in Mississippi had been sentenced to life without parole. When *Miller* was decided, four of these individuals had direct appeals pending, and since *Miller*, eighty-three have filed a total of eighty-five post-conviction motions raising *Miller* claims. Of the eighty-five post-conviction cases, forty-four of the sentences have since been vacated and remanded for resentencing, and forty resentencing proceedings were pending as of August 2018. (One person died prior to resentencing.) Of the forty-four juveniles who were resentenced, thirty-one were sentenced to life with eligibility for parole, and thirteen were sentenced to life without parole. *Juvenile Life Without Parole in Mississippi* (August 2018), http://www.ospd.ms.gov/REPORTS/Juvenile Life without Parole report 08-2018.pdf.

**STANDARD OF REVIEW**

¶24. "[T]here are two applicable standards of review in a *Miller* case. First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." *Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018). Second, "[i]f the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id.*

**DISCUSSION**

**1. Does the Eighth Amendment require the circuit court to make a specific finding of permanent incorrigibility?**

¶25. Ealy argues that the Eighth Amendment to the United States Constitution requires a sentencing authority to specifically find that a juvenile is permanently incorrigible before it imposes a life without parole sentence. Ealy asserts that because the circuit court made no such finding—and because the circuit court stated that it "th[ought] that everybody can be rehabilitated"—reversible error occurred.

¶26. In *Miller*, the United States Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. While a life without parole sentence is still permissible, the sentencer "must have the opportunity to consider mitigating circumstances . . . ." *Id.* In *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016), the Supreme Court further stated that a life without parole sentence should be reserved for "those rare children whose crimes reflect irreparable corruption," and that juvenile murderers "whose crimes reflected only transient immaturity" must be deemed parole eligible. *Id.* at 736.

¶27. Ealy concedes that the Mississippi Supreme Court and this Court have consistently

11

rejected the argument that *Miller* and its progeny require a determination of "permanent incorrigibility" or "irretrievable depravity" before sentencing a juvenile to life without parole.[3] In its most recent decision on this issue, our supreme court held that the United States Supreme Court's decision in *Montgomery*, 136 S. Ct. at 735, "confirmed that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility." *Chandler*, 242 So. 3d at 69 (¶15). In *Wharton v. State*, No. 2017-CA-00441-COA, 2018 WL 4708220, at *3 (¶11) (Miss. Ct. App. Oct. 2, 2018), this Court, citing *Chandler*, reiterated that "Mississippi law does not require a specific finding of a juvenile offender's 'permanent incorrigibility.'" *Id.* In fact, "the sentencing judge is not required to make any specific 'finding of fact.'" *Jones v. State*, No. 2015-KA-00899-COA, 2017 WL 6387457, at *5 (¶17) (Miss. Ct. App. Dec. 14, 2017), *reh'g denied* (Apr. 24, 2018), *cert. dismissed*, 2015-CT-00899-SCT (Nov. 29, 2018).[4]

¶28.    Ealy argues that Mississippi should adopt the dissent's position in *Chandler* that "the

---

[3] *Chandler*, 242 So. 3d at 69 (¶9); *see also Wharton v. State*, 2017-CA-00441-COA, 2018 WL 4708220, at *3 (¶11) (Miss. App. Oct. 2, 2018); *Jones v. State*, No. 2015-KA-00899-COA, 2017 WL 6387457, at *5 (Miss. Ct. App. Dec. 14, 2017), *reh'g denied* (Apr. 24, 2018), *cert. dismissed*, 2015-CT-00899-SCT (Nov. 29, 2018); *Cook v. State*, 242 So. 3d 865, 873 (Miss. Ct. App. 2017).

[4] In *Jones*, we found no reversible error where the sentencing judge made no specific finding of irreparable corruption before sentencing Brett Jones, a juvenile, to life without parole. *Jones*, 2017 WL 6387457 at *5 (¶17). Jones petitioned the Mississippi Supreme Court for certiorari review. After holding oral argument en banc, the supreme court dismissed the certiorari petition on November 29, 2018. *See* M.R.A.P. 17(f) ("Prior to final disposition, the Supreme Court may, on its own motion, find there is no need for further review and may dismiss the certiorari proceeding."). Jones then filed for certiorari review with the United States Supreme Court on the sole issue of whether the sentencing authority must make a finding of permanent incorrigibility; that matter is still pending. *Jones v. Mississippi*, No. 18-1259.

12

trial court, at a minimum, should . . . address[] [the defendant's] capacity for rehabilitation and ma[k]e an on-the-record finding that [the defendant] [i]s one of the rare juvenile offenders whose crime reflected permanent incorrigibility." *Chandler*, 242 So. 3d at 72 (¶28) (Waller, C.J., dissenting). But that is outside the scope of this Court's power. "This Court is duty bound to uphold and apply all precedent handed down from the supreme court . . . ." *Carr v. State*, 942 So. 2d 816, 817 (¶4) (Miss. Ct. App. 2006).

¶29.    So today we again reiterate the holding in *Chandler* that neither the Eighth Amendment nor *Miller* and its progeny require sentencing authorities to make specific findings of "permanent incorrigibility" or "irretrievable depravity" in juvenile resentencings. The circuit court weighed the *Miller* factors, reviewed "the voluminous records," heard testimony at the *Miller* hearing, witnessed Ealy's demeanor firsthand at the hearing, and determined the evidence supported a life without parole sentence. Its review complied with *Miller*.

### 2.    Does due process require the circuit court to make a specific finding of permanent incorrigibility?

¶30.    Ealy argues that due process—protected by the Fourteenth Amendment to the United States Constitution and Article 3, Section 14 of the Mississippi Constitution—requires a sentencing authority to make a specific finding that a juvenile is permanently incorrigible before it imposes a life without parole sentence.

¶31.    While the United States Supreme Court in *Miller* and *Montgomery* established a new substantive rule of constitutional law regarding the sentencing of juveniles, it also made clear that, giving fidelity to federalism, it "le[ft] to the States the task of developing appropriate

13

ways to enforce the constitutional restriction upon their execution of sentences." *Montgomery*, 136 S. Ct. at 735 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)). Ealy argues that the Mississippi Supreme Court's holding that circuit courts are not required to make a specific finding as to a juvenile defendant's permanent incorrigibility does not comport with due process. Again, though, this Court is bound by the rulings of the Mississippi Supreme Court. *Carr*, 942 So. 2d at 817 (¶4). Our supreme court has found that *Miller* does not require an explicit finding on a juvenile's incorrigibility. *Chandler*, 242 So. 3d at 69 (¶15). We find the circuit court complied with the requirements of *Miller* and *Parker*.

### 3. Was the circuit court the proper sentencing authority?

¶32. Ealy next asserts that the Sixth and Fourteenth Amendments to the United States Constitution and Article 3, Sections 14 and 31 of the Mississippi Constitution require that a jury must determine permanent incorrigibility beyond a reasonable doubt.

¶33. Ealy reasons that because *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires a jury to find beyond a reasonable doubt any fact that increases the penalty for a crime, it follows that a jury must determine beyond reasonable doubt whether a juvenile offender is ineligible for parole under *Miller*. However, Ealy's argument hinges on the sentencing authority specifically determining whether a defendant is permanently incorrigible. That is, if permanent incorrigibility must be proven, it is a finding of fact that must be proven beyond a reasonable doubt and determined by a jury. As explained above, the Mississippi Supreme Court has interpreted *Miller* and *Montgomery not* to require a specific finding on permanent

14

incorrigibility.[5] Ealy's argument is also contrary to a prior decision of this Court.

¶34. In *Cook*, seventeen-year-old Jerrard Cook pled guilty to capital murder, and the circuit court sentenced him to life without parole. *Cook*, 242 So. 3d at 868 (¶1). After *Miller*, the circuit court resentenced Cook, again to life without parole. *Id.* at (¶3). Cook appealed, arguing that he had a constitutional right to jury sentencing. *Id.* at 876 (¶38). In evaluating his claim, we noted that because he pled guilty, "Cook waived his right to a jury trial and confirmed that he understood that he would be sentenced by the judge. He did so in writing and under oath." *Id.* at 877 (¶43).

¶35. We further held in *Cook* that "unless the United States Supreme Court's opinions in *Miller* and *Montgomery* do not mean what they specifically say—that a judge may sentence the offender to [life without parole]—Cook does not have a constitutional right to be resentenced by a jury." *Id.* at 876 (¶40). Thus, because Cook pled guilty and the United States Supreme Court precedent allowed for it, the proper sentencing authority was the circuit court. *Id.*; *see also McGilberry v. State*, No. 2017-KA-00716-COA, 2019 WL 192345, at *4 (¶13) (Miss. Ct. App. Jan. 15, 2019) ("McGilberry has cited no authority that would persuade us to reconsider our holding [in *Cook*].").

---

[5] In May 2019, the Mississippi Supreme Court handed down an opinion finding—as a matter of first impression—that juveniles convicted of capital murder post-*Miller* have a statutory right to initial sentencing by a jury under Mississippi Code Annotated section 99-19-101 (Rev. 2015). *Moore v. State*, No. 2017-KA-00379-SCT, 2019 WL 2295774, at *3 (¶¶46-59) (Miss. 2019). Notably though, the supreme court made no finding that the jury must make a specific finding of permanent incorrigibility. Regardless, Ealy was not convicted post-*Miller*, and he was not sentenced under the statutory scheme of section 99-19-101, as he pled guilty to murder and not capital murder. So the *Moore* decision regarding the right to jury sentencing does not apply to this appeal.

15

¶36. Ealy pled guilty to murder. He signed a plea petition stating that he waived his right to trial by a jury and understood that any sentence would be determined by the circuit court. *Ryals v. State*, 881 So. 2d 933, 935 (¶10) (Miss. Ct. App. 2004). As in *Cook*, we hold here that as a result of Ealy's guilty plea, the circuit court was the proper sentencing authority for his resentencing.

**4.    Did the circuit court incorrectly place the burden on Ealy to prove parole eligibility?**

¶37. In his next issue, Ealy argues that the circuit court erred by placing the burden on him to prove parole eligibility. Ealy argues that in order to comply with *Miller*, procedural safeguards must be put in place to ensure that only permanently incorrigible juvenile homicide offenders are sentenced to life without parole. In order to do this, he argues, the State must be required to prove parole ineligibility.

¶38. Again, Ealy's contention is contrary to Mississippi law. In *Jones v. State*, 122 So. 3d 698, 702 (¶14) (Miss. 2013), the Mississippi Supreme Court stated that a life without parole sentence is proper for "juveniles who *fail to convince the sentencing authority* that *Miller* considerations are sufficient to prohibit its [imposition]." (Emphasis added). This Court later interpreted this as "plac[ing] the burden on the offender to persuade the judge that he is entitled to relief under *Miller*." *Cook*, 242 So. 3d at 873 (¶25). We reiterate that holding here. Ealy bore the burden of showing that *Miller* prohibited the imposition of a life without parole sentence.

**5.    Did the circuit court apply an incorrect legal standard?**

¶39. Ealy next contends that the circuit court incorrectly stated that the "controlling factor"

16

in sentencing is whether the circumstances of the "crime reflected a person who was suffering from only a transient immaturity." He asserts that this is the incorrect legal standard and asks this Court to vacate his sentence and remand this matter for resentencing under the correct legal standard. Application of the correct legal standard is reviewed de novo. *Chandler*, 242 So. 3d at 68 (¶7).

¶40.    "[T]he correct legal standard" in determining a juvenile's parole eligibility is "the relevant factors outlined in *Miller* and *Parker*." *Cook*, 242 So. 3d at 876 (¶37). The record reflects that the circuit court considered the appropriate factors. The circuit court's statement in context regarding its findings is as follows:

> In looking at all [the *Miller*] factors, three of the four factors, to some degree, have factors that favor parole; three or four factors have things that would not favor parole. But the *controlling factor in my mind* is the circumstances of the homicide and I just can't say from looking at all of this that this crime reflected a person who was suffering from only a transient immaturity. Therefore, the nature and circumstances of the crime support a sentence of life without parole.

(Emphasis added). The circuit court further set out the law as follows:

> The United States Supreme Court has said that life without parole is valid only for those rare children whose crimes reflect the irreparable corruption.
>
> The Supreme Court has further said that the Eighth Amendment mandates parole eligibility for juvenile murderers whose crimes reflect only transient immaturity.
>
> The Mississippi Supreme Court has said that life without parole can be applied constitutionally to juveniles who fail to convince the sentencing authority that *Miller* considerations are sufficient to prohibit its applications, and it set out the *Miller* factors and I'm going to go through those factors now based upon the evidence that was put on. All the evidence is contained in the record, the file, and it was put on at the hearing.

17

¶41. It is clear that the circuit court understood the law and applied "the correct legal standard, i.e., the relevant factors outlined in *Miller* and *Parker*." *Cook*, 242 So. 3d at 876 (¶37). The circuit court also correctly stated that "the Eighth Amendment mandates parole eligibility for juvenile murderers 'whose crimes reflected only transient immaturity.'" *Id.* at 870 (¶9) (quoting *Montgomery*, 136 S. Ct. at 736). The circuit court then went beyond what is required by making specific findings on each *Miller* factor. *Jones*, 2017 WL 6387457 at *5 (¶17) ("[T]he sentencing judge is not required to make any specific 'finding of fact.'"). Thus, we find that the circuit court applied the correct legal standard.

**6. Are the circuit court's statements regarding the circumstances of the crime supported by the evidence?**

¶42. Ealy argues that the circuit court's findings regarding the circumstances of the crime are inaccurate and that its conclusions are inconsistent with the scientific understanding of the influence of peer pressure in children underlying the Supreme Court's decision in *Miller*. This argument focuses on the third *Miller* factor: the "circumstances of the homicide offense, including the extent of [the defendant's] participation in the conduct and the way familial and peer pressures may have affected him." *Miller*, 567 U.S. at 477.

¶43. In a *Miller* sentencing, as long as the circuit court applies the correct legal standard, we review its decision for abuse of discretion. *Chandler*, 242 So. 3d at 68 (¶7). We will not "substitute our own collective view of an appropriate sentence for the considered judgment of the circuit judge, who listened to and observed the demeanor of the witnesses at sentencing and the offender himself, looked the offender in the eye, and imposed what he adjudged to be a just sentence." *Cook*, 242 So. 3d at 873 (¶24).

18

¶44. Regarding the circumstances of the crime, Ealy argues that the circuit court based its findings on unreliable, self-serving excerpts from Dunta's initial statement to law enforcement—(1) that Ealy provided the handguns that were used in the crime; (2) that Ealy and Dunta went back to the truck after using Jeanes's phone the first time; and (3) that Ealy shot Jeanes. Ealy argues Dunta's statement is entirely unreliable because Dunta later confessed that he was the shooter, not Ealy. Ealy also cites the circuit court's finding that the crime "was a planned action" and argues this finding is incorrect because the evidence showed the only "planned action" was the theft of vehicles and four-wheelers. Ealy points to Investigator Edgar's testimony that based on the statements he took from Ealy, Dunta, and Robert, "they did go there planning to steal from [Jeanes]," but Investigator Edgar stopped short of giving an opinion on whether they planned to commit murder.

¶45. But it is clear from the record that the circuit court did not consider any evidence in isolation. The court recognized the inconsistences in the evidence. The circuit court stated: "In his statement [Dunta] said Mr. Ealy shot Mr. Jean[e]s. In his guilty plea, Ealy said [Dunta] shot Mr. Jean[e]s. Even if I accept that [Dunta] shot Mr. Jean[e]s, Ealy appears to be a leader or at least a co-equal participant." The circuit court later, in making its ultimate conclusion, based its decision on the presumption that "Ealy was *not* the actual killer." (Emphasis added).

¶46. In additional to Dunta's statements, the court had before it Robert's account of the crime. Robert, who remained in the stolen truck parked near Jeanes's house, gave a statement that corroborated Dunta's account of the events leading up to the Jeanes's murder. Robert

19

told police that once the three arrived at Jeanes's home, Ealy and Dunta walked up to the door. Once Jeanes appeared, Robert saw Ealy borrow Jeanes's phone, hand it back to him, and return to the vehicle where Robert was waiting. Robert stated that he was then told he would need to drive the vehicle they had arrived in back to Jackson. Robert then witnessed Ealy and Dunta walk back to Jeanes's door and borrow his phone again. Robert then heard a gunshot and saw Ealy and Dunta stealing items from Jeanes's house.

¶47.   While Ealy argues the shooting was not planned, the circuit court considered the circumstances of the crime and that Ealy had multiple opportunities to abandon the crime. The circuit court took into account that Ealy and Dunta had planned for days to steal four-wheelers and that they arrived at Jeanes's home armed with handguns. While in the vehicle prior to the shooting, Ealy made the statement that "a dead man can't talk." The circuit court found that Ealy could have left the scene at that point rather than returning to Jeanes's house, but that Ealy and Dunta proceeded back to Jeanes's house because they "wanted what they wanted no matter what they had to do to get it."

¶48.   Regarding whether the crime was the result of peer pressure, the court found that despite Ealy's age—sixteen—he did not act as "a direct result of any peer pressure"; rather, "it appear[ed] to be more of a lack of respect for human life and for other people's property. That would seem to be a motivator for these types of crimes regardless of the age . . . ." Again, Ealy was the oldest of the three participants in the crime, and the court found he was "a leader or at least co-equal participant." The court found that although Ealy was not the actual killer, "the evidence presented show[ed] . . . that [the murder] happened how Ealy

20

expected it to happen and it happened after there had been plenty of time for Ealy and [Dunta] to abandon the crime." Dr. Lott testified that while Ealy's "affiliation with [Dunta and Robert] significantly impacted his behavior," it did not impact Ealy's ability to choose not to participate in the crime. Specifically, Dr. Lott stated that he could not find Ealy's participation in the crime was a result of Ealy's succumbing to another person's influence.

¶49. The circuit court's decision is supported by substantial evidence and is not an abuse of discretion.

### 7. Is Ealy's sentence unconstitutional?

¶50. Ealy's final claim is that life without parole sentences for juveniles are categorically unconstitutional, and he asks this Court to join several state supreme courts in determining that all such sentences for juveniles violate the Eighth Amendment to the United States Constitution and other state constitutional provisions. But "the United States Supreme Court has declined to announce such a categorical rule." *Cook*, 242 So. 3d at 877 (¶45) (citing *Miller*, 567 U.S. at 469). And the Mississippi Supreme Court has recognized that "*Miller* does not prohibit sentences of life without parole for juvenile offenders." *Parker*, 119 So. 3d at 995 (¶19). The Legislature sets the length of sentences, *Stromas v. State*, 618 So. 2d 116, 123 (Miss. 1993), and neither this State nor the United States Supreme Court has found a life without parole sentence for juveniles to be a constitutional violation, so long as the requirements of *Miller* and *Montgomery* are met. Under *Miller* and *Montgomery* and the decisions of this State, Ealy's sentence is not unconstitutional.

### CONCLUSION

21

¶51. The circuit court applied the correct legal standard and did not abuse its discretion in sentencing Ealy to life without parole, nor does the sentence imposed violate the United States Constitution or the Mississippi Constitution. The circuit court's decision is affirmed.

¶52. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., TINDELL, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. LAWRENCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, TINDELL, McDONALD AND McCARTY, JJ. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

**LAWRENCE, J., SPECIALLY CONCURRING:**

¶53. I concur with the result reached by the majority. I believe the circuit court's findings based on the judge's on-the-record comments, together with the court's written order, clearly show that the court found Ealy should be sentenced to life without parole. However, neither the judge's on-the-record comments nor the court's order included a determination that Ealy was irreparably corrupt or permanently incorrigible. I write separately to express my concerns about our current precedent holding that a circuit court does not have to articulate that finding on-the-record before sentencing a juvenile to life without parole.

¶54. The United States Supreme Court has held that the Eighth Amendment bars life without parole sentences for the "vast majority of juvenile offenders," and permits this extraordinary punishment only for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016).

¶55. In *Cook v. State*, this Court held that the trial courts are not required to make a written finding of fact regarding a juvenile's incorrigibility. *Cook v. State*, 242 So. 3d 865, 876

22

(Miss. Ct. App. 2017), *reh'g denied* (Nov. 28, 2017), *cert. denied*, 237 So. 3d 1269 (Miss. 2018), and *cert. denied*, 139 S. Ct. 787 (2019). In *Montgomery v. Louisiana*, the United States Supreme Court also stated, "[The fact that] *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole." *Montgomery*, 136 S. Ct. at 735.

¶56.    More recently, in *Chandler v. State*, our supreme court, with a five-justice majority, held that the United States Supreme Court's holding in *Miller v. Alabama*[6] only requires a sentencing authority to hold "a hearing" and "consider[] and tak[e] into account" a set of factors related to youth before imposing a life-without-parole sentence on a child. *Chandler v. State*, 242 So. 3d 65, 68-70 (¶¶8, 12, 21) (Miss. 2018).

¶57.    In his dissent in the *Chandler* case, Chief Justice Waller stated the following:

> *Miller* established that a life-without-parole sentence is an unconstitutionally disproportionate punishment for juvenile homicide offenders whose crimes reflect transient immaturity and can be imposed only on those children whose crimes reflect permanent incorrigibility. *Id*. The United States Supreme Court left to the States the task of ensuring that their sentencing procedures satisfy this holding, and to do this, our trial courts must apply the facts of each particular case to the substantive law.

*Id*. at 72 (¶2) (Waller, J., dissenting). As explained in the dissent, the United States Supreme Court's *Miller* holding left the procedural aspect of compliance to the individual states. Seven state supreme courts have held that as a necessary procedural safeguard, trial courts should be required to make determinations on the record that a defendant is permanently

_____

[6] 567 U.S. 460, 132 S. Ct. 2455, 183 (2012).

23

incorrigible.[7] Since the only time a constitutional sentence of life without parole can be imposed on a juvenile is when they are that "rare" offender who has demonstrated irreparably corrupt behavior or permanent incorrigibility, Justice Waller argued that trial courts ought to be required to make "an on-the-record finding." *Id*.

¶58.    Seven of the eleven state supreme courts that have addressed the "incorrigibility requirement" have held a trial judge must make a specific finding of incorrigibility before sentencing a juvenile to life without parole.  Mississippi is only one of four states that have held an oral or written finding of fact of incorrigibility is not required.[8]  In other words, at present, we require our circuit courts to conduct a sentencing hearing and listen to and evaluate the evidence presented at that hearing under the factors mandated by *Miller*.  That trial court can then sentence a juvenile to life without parole if it finds that the juvenile is irreparably corrupt or permanently incorrigible but, under our present state of the law, does not have to make an on-the-record finding on the matter.  Yet, that life without parole sentence is only constitutional if the circuit court found that the juvenile was irreparably corrupt or permanently incorrigible.

---

[7] *Criminal Law—Life Sentences Without Parole—Supreme Court of Mississippi Affirms a Sentence of Life Without Parole for a Juvenile Offender*—Chandler v. State, 242 So. 3d 65 (Miss. 2018) (en banc), 132 Harv. L. Rev. 1756 n. 67 (April 10, 2019), *available at* https://harvardlawreview.org/2019/04/chandler-v-state/.  (These states include Arizona, Florida, Georgia, Oklahoma, Pennsylvania, Illinois, and Iowa.  *E.g.*, *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017); *People v. Holman*, 91 N.E.3d 849, 863 (Ill. 2017); and *Veal v. State*, 784 S.E.2d 403, 411 (Ga. 2016)).

[8] *See supra* note 7, 132 Harv. L. Rev. 1756 n. 67. "The Virginia, Tennessee, Michigan, and now Mississippi state supreme courts have explicitly held that a finding of incorrigibility is not required."  *People v. Skinner*, 917 N.W.2d 292, 309 (Mich. 2018).

¶59. I write to express concerns about the present state of the law that authorizes that lack of an on-the-record incorrigibility finding. I am concerned that an appellate court will experience more difficulty in conducting a proper review of the constitutionality of that life without parole sentence if the circuit court never indicated it indeed found the juvenile incorrigible. The one element necessary to make that life without parole sentence constitutional is missing from the court's order, and we may be left to presume the trial court actually found that which is required. When a juvenile is facing a life without parole sentence, presumptions should not bring doubt upon the safeguards of the legal and constitutional sentencing process.

¶60. Requiring an on-the-record finding by the circuit court that affirms that a juvenile is permanently incorrigible is not too much to ask when those sentences are supposed to be reserved for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016). The safer practice, and not too burdensome requirement, would be to mandate that trial courts clearly state what they are constitutionally required to find before sentencing a juvenile to life without parole—is this juvenile one of those rare offenders whose crimes have demonstrated that he or she is irreparably corrupt or permanently incorrigible? Because the United States Supreme Court has required one of those two standards be proven before a life without parole sentence can be legally imposed, it would seem prudent and of sound practice to require it to be found on the record either by a ruling from the bench or in a written order. Then, there would be no more guessing as to whether the circuit court indeed found that which is constitutionally

required.

¶61.    Maybe it is time to reconsider this issue and, in the future, act more in accordance with Chief Justice Waller's hope that the circuit courts should be required to make "an on-the-record" finding. *Chandler*, 242 So. 3d 65, 72 (¶2) (Waller, J., dissenting). The findings of fact a circuit court is constitutionally required to make before sentencing a juvenile to life without parole should be free of doubt or guessing.

¶62.    I would find that the circuit court should have made an on-the-record finding that Ealy was one of the rare juvenile offenders whose crime reflected permanent incorrigibility before sentencing him to life without parole. While the written order, read together with the court's order and the on-the-record comments, allows us to surmise that is what the court found, the need to surmise would be greatly curtailed if the court had expressed what it obviously found.

**WESTBROOKS, TINDELL, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**